Brian WRENN, Joshua Akery, Tyler Whidby, and Second Amendment Foundation, Inc., Plaintiffs,

v.

DISTRICT OF COLUMBIA and Cathy L. Lanier, Defendants.

1:15–CV–162 (FJS)

United States District Court, District of Columbia.

Signed May 18, 2015

Gura & Possessky, PLLC, of Counsel Alan Gura, Esq., 105 Oronoco Street, Suite 305, Alexandria, Virginia 22314, Attorneys for Plaintiffs

Office of the Attorney General for the District of Columbia, of Counsel Andrew J. Saindon, Esq., 441 Fourth Street, N.W., Sixth Floor South, Washington, D.C. 20001–2714, Attorneys for Defendants

## MEMORANDUM–DECISION AND ORDER

SCULLIN, Senior Judge

## I. INTRODUCTION

Currently before the Court is Plaintiffs' motion for a preliminary injunction.[1]

## II. BACKGROUND

Plaintiffs filed their complaint in this 42 U.S.C. § 1983 action on February 3, 2015. Three days later, on February 6, 2015, they filed a motion for a preliminary injunction.

Plaintiffs' complaint contains only one cause of action, in which they seek both injunctive and declaratory relief. Specifically, they request that the Court declare that D.C.Code § 22–4506(a)'s grant of discretion to the Police Chief to refuse the issuance of licenses to carry handguns and its "good reason"/"proper reason" requirement, as well as the requirements of D.C.Code § 72709.11 that the Police Chief issue rules to establish the criteria for "good reason" and "other proper reason" for carrying a handgun, including the minimum requirements set forth therein and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4, and 2334.1 violate the Second Amendment to the United States Constitution on their face and as applied to the individual Plaintiffs and other law-abiding, responsible members of Plaintiff Second Amendment Foundation ("SAF"), who otherwise would qualify for a District of Columbia license to carry a handgun. *See* Complaint at ¶ 40. They also ask that the Court permanently enjoin Defendants from enforcing the same.

With regard to their instant motion for a preliminary injunction, the relief that Plaintiffs seek is limited to enjoining Defendants from applying the "good reason"/"proper reason" requirement of D.C.Code § 22–4506(a), including, but not limited to, the manner in which that requirement is defined in D.C.Code § 7–2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4 and 2334.1, to applicants who otherwise meet the requirements of D.C.Code § 22–4506(a) and all other current requirements for possessing and carrying of handguns under District of Columbia law.

## III. DISCUSSION

### A. Statutory scheme

Before analyzing Plaintiffs' motion, it is necessary to set forth the provisions of the District of Columbia's licensing mechanism with which Plaintiffs take issue. In response to this Court's July 24, 2014 Memorandum–Decision and Order in *Palmer v. Dist. of Columbia*, 59 F.Supp.3d 173 (D.D.C.2014), the Council of the District of Columbia ("Council"), on September 23, 2014, voted unanimously to pass Bill 20–926, the "License to Carry a Pistol Emergency Amendment Act of 2014" (the "Emergency Act"). This Act became effective when the Mayor signed it on October 9, 2014.

The Council also introduced permanent legislation, the "License to Carry a Pistol Amendment Act of 2014," Bill 20–930, which was referred to its Committee on

---

1. All references to page numbers in documents that are part of the Court's record are to the page numbers that the Court's electronic filing system generates and that appear in the top-right corner of each page.

the Judiciary and Public Safety. The Council conducted a public hearing on the permanent legislation on October 16, 2014, and the Committee mark-up occurred on November 25, 2014. The first and second readings on the permanent legislation occurred in December 2014. The permanent legislation was transmitted to Congress on March 6, 2015, and the projected law date is June 16, 2015. *See* http://lims.dccouncil. us/Legislation/B20–0930?FromSearch Results true (last visited on May 4, 2015).

Under the current legislation, D.C.Code § 22–4506(a) provides as follows:

The Chief of the Metropolitan Police Department ("Chief") may, upon the application of any person having a bona fide residence or place of business within the District of Columbia, or of a person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his or her person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol concealed upon his or her person within the District of Columbia for not more than 2 years from the date of issue, if it appears that the applicant has good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed. (emphasis added)

In addition, "[t]he Chief of [the Metropolitan Police Department] shall issue rules to implement the provisions of the License to Carry a Pistol Amendment Act of 2014," including the following rules:

(1) To establish criteria for determining when an applicant has, pursuant to section 6 of the Pistols and Other Dangerous Weapons Act:

(A) Demonstrated a good reason to fear injury to his or her person, which shall at a minimum require a showing of a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks that demonstrate a special danger to the applicant's life;

(B) Demonstrated any other proper reason for carrying a concealed pistol, which shall at a minimum include types of employment that require the handling of cash or other valuable objects that may be transported upon the applicant's person; . . . .

Furthermore, Defendant Lanier, as Chief of the Metropolitan Police Department, has adopted various regulations regarding the licensing of individuals to carry concealed handguns, including the following:

A person shall demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life. 24 D.C.M.R. § 2333.1

For the purposes of satisfying the specifications of § 2333.1, a person shall allege, in writing, serious threats of death or serious bodily harm, any attacks on his or her person, or any theft of property from his or her person. The person shall also allege that the threats are of a nature that the legal possession of a pistol is necessary as a reasonable precaution against the apprehended danger. 24 D.C.M.R. § 2333.2

The person shall provide all evidence of contemporaneous reports to the police of such threats or attacks, and disclose whether or not the applicant has made a sworn complaint to the police or the courts of the District of Columbia con-

cerning any threat or attack. 24 D.C.M.R. § 2333.3

The fact that a person resides in or is employed in a high crime area shall not by itself establish a good reason to fear injury to person or property for the issuance of a concealed carry license. 24 D.C.M.R. § 2333.4

A person may allege any other proper reason that the Chief may accept for obtaining a concealed carry license which may include:

> (a) Employment of a type that requires the handling of large amounts of cash or other highly valuable objects that must be transported upon the applicant's person; or

> (b) The need for a parent, son, daughter, sibling, or other adult member of the immediate family to provide protection of a family member who is physically or mentally incapacitated to a point where he or she cannot act in defense of himself or herself, and the family member who is physically or mentally incapacitated can demonstrate a good reason to fear injury to his or her person by showing a special need for self-protection distinguishable from the general community as supported by evidence of specific threats or previous attacks which demonstrate a special danger to the applicant's life in the manner described in § 2333. 24 D.C.M.R. § 2334.1

## B. Standard for reviewing a motion for a preliminary injunction

As stated, currently before the Court is Plaintiffs' motion for a preliminary injunction to enjoin Defendants from applying the "good reason"/"proper reason" requirement of D.C.Code § 224506(a), including, but not limited to, the manner in which that requirement is defined in D.C.Code § 7–2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4 and 2334.1, to applicants who otherwise meet the requirements of D.C.Code § 22–4506(a) and all other current requirements for possessing and carrying of handguns under District of Columbia law.

■ A party seeking a preliminary injunction must demonstrate " '(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction.' " *Davis v. Billington*, No. 10–0036, 76 F.Supp.3d 59, 63–64, 2014 WL 7204782, *2 (D.D.C. Dec. 19, 2014) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C.Cir. 2006)). When evaluating these factors, the District of Columbia Circuit uses a " 'sliding-scale approach.' " *Id.* (citation and footnote omitted). Under this approach, " '[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor.' " *Id.* (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C.Cir. 2009)).[2]

■ Since " 'a preliminary injunction is an extraordinary and drastic remedy,

---

**2.** As the court noted in *Henke v. Dep't of Interior*, 842 F.Supp.2d 54 (D.D.C.2012), the District of Columbia Circuit "has suggested, without deciding, that *Winter* [*v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008),] should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Id.* at 58 (citing *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C.Cir.2011); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C.Cir.2009)).

... the [party] seeking to invoke such stringent relief is obliged to establish a clear and compelling legal right thereto based upon undisputed facts.'" *Id.* at *3 (quoting *In re Navy Chaplaincy*, 928 F.Supp.2d 26, 36 (D.D.C.) (internal citations and quotation marks omitted), *aff'd*, 738 F.3d 425 (D.C.Cir.2013)). Moreover, "[a] party who seeks a mandatory injunction to change (rather than preserve) the status quo 'must meet a higher standard than in the ordinary case by showing "clearly" that he or she is entitled to relief or that "extreme or very serious damage" will result from the denial of the injunction.'" *In re Guantanamo Bay Detainee Litig.*, 570 F.Supp.2d 13, 17 n. 3 (D.D.C. 2008) (quoting *Veitch v. Danzig*, 135 F.Supp.2d 32, 35 (D.D.C.2001)).[3]

The Court will address each of these requirements in turn.

### 1. *Likelihood of success on the merits*

As the court stated in *In re Guantanamo Bay Detainee Litig.*, "absent a 'substantial indication' of likely success on the merits, 'there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review.'" *In re Guantanamo Bay Detainee Litig.*, 570 F.Supp.2d at 17 (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F.Supp.2d 114, 140 (D.D.C.1999)). Thus, to obtain a preliminary injunction, Plaintiffs must first and foremost establish that they are likely to succeed on the merits of their claim that the District of Columbia's requirement that they demonstrate "good reason"/"proper reason" in order to obtain a license to carry a concealed handgun in public for the purpose

of self-defense violates their Second Amendment right to bear arms.

■ In *Palmer v. Dist. of Columbia*, 59 F.Supp.3d 173 (D.D.C.2014), this Court concluded that the Second Amendment right to bear arms, although subject to traditional restrictions, includes the right to carry an operable handgun outside the home for self-defense. *See id.* at 180–181; *see also Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir.2014); *Moore v. Madigan*, 702 F.3d 933 (7th Cir.2012). Therefore, consistent with its decision in *Palmer*, this Court again concludes that, although subject to traditional restrictions, there exists a right under the Second Amendment to carry handguns in public for self-defense. Having so concluded, the specific issue this Court must decide in the present case is whether Plaintiffs have established a likelihood of success on the merits of their claim that the District of Columbia's "good reason"/"proper reason" requirement violates that right because it impermissibly burdens their Second Amendment right to bear arms; that is, it unreasonably denies otherwise qualified individuals the right to carry a handgun for self-defense.

■ In *Heller v. Dist. of Columbia*, 670 F.3d 1244 (D.C.Cir.2011) ("*Heller II*"), the circuit court explained that, where there exist firearm regulations that may or may not burden the exercise of one's Second Amendment rights, it would adopt, as had other circuits, a two-step approach to determine the constitutionality of such firearm regulations. *See id.* at 1252 (citations omitted). The first step in this analysis requires that the court determine whether

---

**3.** The Court notes that, although "[s]ome D.C. District Courts have held that mandatory injunctions [that change the status quo] require applicants to 'meet a higher standard ...' ... [i]t appears ... that the D.C. Circuit has not yet adopted this rule...." *Boivin v. U.S.*

*Airways, Inc.*, 297 F.Supp.2d 110, 115 n. 5 (D.D.C.2003) (internal quotation and other citations omitted). Nonetheless, in view of the prevailing authority throughout the circuits, it seems appropriate to apply this standard.

a particular statutory provision impinges on a right that the Second Amendment protects. *See id.* If it does, the court proceeds to determine whether the provision at issue unlawfully burdens that right under the appropriate level of constitutional scrutiny. *See id.* (citations omitted).

■ With respect to the first step of this analysis, the Supreme Court in *Heller* instructs that "longstanding" regulations are "presumptively lawful," *Dist. of Columbia v. Heller,* 554 U.S. 570, 626–27 & n. 26, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); that is, "they are presumed not to burden conduct within the scope of the Second Amendment." *Heller II,* 670 F.3d at 1253 (citations omitted). The court in *Heller II* explained that "this is a reasonable presumption because a regulation that is 'longstanding,' which necessarily means it has long been accepted by the public, is not likely to burden a constitutional right...." *Id.* However, a plaintiff may rebut this presumption by demonstrating that the regulation has more than a *de minimis* effect on his right. *See id.*

Defendants argue that, because the District of Columbia's regulation of the public carrying of guns is "longstanding," its "good reason"/"proper reason" requirement is presumed not to violate Plaintiffs' Second Amendment right to bear arms. To support this position, Defendants note that the District of Columbia has been regulating guns for more than two centuries. *See* Dkt. No. 9 at 14. For example, in 1801 the then-Town of Georgetown prohibited firing guns in its "inhabited parts." *See id.* (citing Town of Georgetown Ordinance of Oct. 24, 1801). In 1809, the City of Washington similarly made it unlawful to fire guns " 'within four hundred yards of any house ... or on the Sabbath.' " *See*

*id.* (quoting Act of the Corporation of the City of Washington of Dec. 9, 1809). In 1857, the District of Columbia authorized the filing of civil complaints by " 'any person having reasonable cause to fear an injury or breach of the peace' against any person who 'shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property[.]' " *See id.* (quoting Revised Code of the District of Columbia, ch. 141, § 16 (1857)). Also, in the same year, the District of Columbia "made it unlawful to carry 'deadly or dangerous weapons, such as ... pistol[s].' " *See id.* (quoting Act of the Corporation of the City of Washington of Nov. 4, 1857) (citing Act of Nov. 18, 1858).

Defendants also note that, in 1892, Congress barred persons throughout the District of Columbia from having such weapons " 'concealed about their person' outside of the person's 'place of business, dwelling house, or premises.' " *See id.* (quoting Act of July 13, 1892, ch. 159, 27 Stat. 116). Finally, "[i]n 1932, Congress required licenses for carrying pistols and other concealable weapons outside of one's home or place of business." *See id.* (citing Act of July 8, 1932, ch. 465, Pub.L. No. 72–275, 47 Stat. 651). Based on this history, Defendants assert that, "leaving aside the recent legislation, the District's regulation of firearms generally and concealed weapons in particular is manifestly 'longstanding' and therefore does not burden conduct within the scope of the Second Amendment." *See id.*[4]

In response, Plaintiffs point out that Defendants "advanced th[is] same argument

---

4. Defendants reference decisions in other jurisdictions, in which the courts have found the legislative history to be longstanding.

However, those decisions are not relevant to the District of Columbia's legislative history.

in *Heller*, citing early public discharge laws for the proposition that there was no right to keep a gun for self-defense [and][t]he Supreme Court rejected that argument." *See* Dkt. No. 10 at 15.

Plaintiffs also distinguish the 1857 law, which references a good-reason type requirement, but which Plaintiffs argue undermines Defendants' position. *See id.* The 1857 law "provided that an individual going armed 'without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property ... find sureties for keeping the peace for a term not exceeding six months,' upon 'complaint of any person having reasonable cause to fear an injury or breach of the peace.'" *See id.* at 15–16. Plaintiffs assert that this means that a "complainant would have to establish 'reasonable cause' that the gun-carrier would injure him or breach the peace ... [and][d]oing so would result not in any criminal sanction or even prohibition on the carrying of arms, but only the temporary posting of sureties. That is a far cry from requiring the individual gun-carrier to prove a good reason for so doing." *See id.* at 16.[5] Finally, in 1943 the District of Columbia amended its statutes to prohibit the unlicensed carrying of pistols, whether openly or concealed. *See id.* at 17 (quoting *Cooke v. United States*, 275 F.2d 887, 889 n.3 (D.C.Cir. 1960)).[6]

▮ Despite Defendants' lengthy dissertation of the District of Columbia's history of firearm regulation, with the possible exception of the 1857 statute, which refers to a "good-reason type" requirement that is clearly distinguishable from the requirement at issue here, Defendants have not presented any historical evidence to support their argument that the District of Columbia's "good reason"/"proper reason" requirement is longstanding.

In any event, as Plaintiffs point out, "the 'longstanding' inquiry is irrelevant" because the District of Columbia's "good reason"/"proper reason" requirement "has far more than a 'de minimis' effect on [their] rights it completely bars the right from being exercised, at all times and places and in any manner, without exception." *See* Dkt. No. 10 at 17. Plaintiffs, as well as the vast majority of law-abiding citizens, who fail to satisfy the District of Columbia's "good reason"/"proper reason" requirement because they cannot "show a special need for self-protection distinguishable from the general community" or that they are engaged in a "type[ ] of employment that require[s] the handling of cash or other valuable objects that may be transported upon [their] person," are unable to exercise their fundamental right to bear arms for self-defense under the Second Amendment. Thus, the Court concludes that the District of Columbia's "good reason"/"proper reason" requirement impinges on Plaintiffs' Second Amendment right to bear arms.

The Court must next determine whether that impingement unlawfully burdens that right. To do that, the Court must first

---

**5.** In 1892, Congress enacted a statute that was effective until 1932, which proscribed the open carrying of handguns if carried with the intent to use them illegally. A replacement law in 1932 continued the ban on the unlicensed concealed carrying of handguns but did not mention the open carrying of handguns.

**6.** Plaintiffs assert that, "if in 1943, Congress had looked to the federal courts for constitutional guidance in enacting this provision, it would have only been misled by the then-emerging, erroneous 'collective rights' doctrine." *See* Dkt. No. 10 at 17 (citing *United States v. Tot*, 131 F.2d 261, 266 (3d Cir.1942), *rev'd on other grounds*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943); *Cases v. United States*, 131 F.2d 916, 921 (1st Cir.1942)).

determine the degree of constitutional scrutiny to which this regulation is appropriately subject. There are three levels of scrutiny that are potentially available to the Court when analyzing the constitutionality of a statute: rational basis review, intermediate scrutiny, and strict scrutiny. In *Heller*, the Supreme Court made clear that courts may not apply rational basis review to a law that burdens protected Second Amendment conduct. *See Heller*, 554 U.S. at 628 n. 27, 128 S.Ct. 2783.

■ Furthermore, in *Heller II*, the circuit court, in addressing the appropriate level of constitutional scrutiny to apply to the District of Columbia's firearm registration requirements, decided to apply intermediate scrutiny to those requirements. *See Heller II*, 670 F.3d at 1257. Although the Court recognizes that there is a substantive difference between the registration requirements at issue in *Heller II* and the District of Columbia's "good reason"/"proper reason" requirement at issue in this case, the Court, nonetheless, concludes that intermediate scrutiny applies to this requirement as well.[7]

In *Heller II*, the circuit court held that intermediate scrutiny required that the District of Columbia demonstrate that its firearm registration requirements were " 'substantially related to an important governmental objective.' " *Heller II*, 670 F.3d at 1258 (quotation omitted). The court explained that this meant that the District of Columbia had to establish a tight "fit" between its firearm registration requirements and a substantial governmental interest, "a fit 'that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.' " *Id.* (quotation and other citation omitted). In other words, the District of Columbia had to show that its firearms registration requirements were not broader than necessary to achieve its substantial government interest. *See id.* (citing *Ward [v. Rock Against Racism]*, 491 U.S. [781] , 782–83, 109 S.Ct. 2746, 105 L.Ed.2d 661 [ (1989) ] ).

In applying *Heller II* to the facts of this case, the Court concludes that, to pass muster under intermediate scrutiny, the District of Columbia must demonstrate that its "good reason"/"proper reason" requirement is not broader than necessary to achieve its substantial government interest in preventing crime and protecting public safety. As the Ninth Circuit explained in *Peruta*, although the Supreme Court in *Turner Broad. Sys., Inc. v. FCC ("Turner II")*, 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), instructed that courts must afford deference to the legislature's judgment when determining whether a statute could withstand intermediate scrutiny, the Court did so only with respect to the first part of that analysis. *See Peruta*, 742 F.3d at 1177. However, when assessing the "fit" between the government's important interest and the means that the government selected to advance that interest, the Court in *Turner II* did not afford any such deference to the legislature's decision. *See id.* Rather, it required that the government establish that its statute did not burden the right substantially more than was necessary to further its important interests. *See id.* (quotation omitted); *cf. Moore v. Madigan*, 702 F.3d 933 (7th Cir.2012). This Court agrees that deference should be given to the District of Columbia's stated governmental interest in preventing crime and

---

7. Other circuits likewise have found intermediate scrutiny to be the appropriate standard when reviewing firearms regulations vis-a-vis the Second Amendment. *See, e.g., Drake v.* *Filko*, 724 F.3d 426 (3d Cir.2013); *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir.2013); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir.2012).

protecting public safety; however, *Taylor II*, as well as *Heller II* and *Peruta*, requires that the District of Columbia demonstrate that its "good reason"/"proper reason" requirement is not broader than necessary to achieve this important governmental interest.[8]

Plaintiffs argue that the District of Columbia's "good reason"/"proper reason" requirement fails intermediate scrutiny because it does not advance its interest in preventing crime or protecting public safety. *See* Dkt. no. 6–2 at 25. Specifically, this regulation is not directed at dangerous people, does not regulate the manner of carrying handguns, and does not impose any place restrictions. *See id.* (citing *Peruta*, 742 F.3d at 1176–77). To support this position, Plaintiffs rely on *Fletcher v. Haas*, 851 F.Supp.2d 287 (D.Mass.2012), and *Bateman v. Perdue*, 881 F.Supp.2d 709 (E.D.N.C.2012).

In *Fletcher*, the state law at issue barred lawful resident aliens from possessing guns. The court struck down the law, reasoning that, because the law was premised on the assumption that lawful permanent residents were categorically dangerous and all American citizens were trustworthy, it lacked even a reasonable basis and, thus, could not withstand either intermediate or strict scrutiny. *See*

*Fletcher*, 851 F.Supp.2d at 303. Likewise, in *Bateman*, the court struck down laws barring handgun carrying during so-called "states of emergency," finding that those laws effectively banned the public at large from carrying handguns for self-defense, conduct that was at the very core of the Second Amendment. *See Bateman*, 881 F.Supp.2d at 716.

In response, Defendants argue that the District of Columbia's "good reason"/"proper reason" requirement reasonably furthers its important governmental interest in reducing the number of concealed weapons in public in order to reduce the risks to other members of the public and to reduce the disproportionate use of such weapons in the commission of violent crimes. *See* Dkt. No. 9 at 19.

Furthermore, Defendants cite to the Report of the District of Columbia Council's Committee on the Judiciary and Public Safety ("Committee Report"),[9] which, among other things, summarized the testimony that the Committee had received from Chief Lanier about the safety issues facing the District of Columbia.[10] The Report also cited the empirical evidence that it had considered, which purported to show that "right-to-carry" laws were associated with substantially higher rates of aggravated assault, rape, robbery and murder.[11]

---

**8.** It is in this regard that the Court finds the Second, Third and Fourth Circuits' application of intermediate scrutiny to the firearms licensing regulations before them uninstructive. In analyzing the regulations before them, these courts either afforded too much deference to the legislature's conclusions or did not address whether the statutes at issue were no broader than necessary to achieve the government's substantial objectives. *See Peruta*, 742 F.3d at 1177.

**9.** The Committee Report is available online at http://lims.dccouncil.us/Download/32576/B 20–0930–CommitteeReport1.pdf (last visited May 14, 2015).

**10.** The Committee held a public hearing on Bill 20–930 on October 16, 2014.

**11.** This evidence would appear to be contradicted by, among other things, the Federal Bureau of Investigation's *Uniform Crime Reports: Crime in the United States 2013, Table 4*, http://www.fbi.gov/about–us/cjis/ucr/crime–in–the–u.s/2013/crime–in–the–u.s.–2013/tables/4 tabled atadecoverviewpdf/table_ 4_ crime_ in_ the_ united_ states_ by_ region_ geographic_ division_ and_ state_ 2012–2013.xls (last visited May 18, 2015. The point is that the empirical evidence on this issue is not conclusive.

There is no dispute that the Committee Report sets forth in detail the reasons that the District of Columbia implemented the current licensing mechanism. However, the issue here is not whether the District of Columbia's "good reason"/"proper reason" requirement is a reasonable or wise policy choice. Rather, the issue is whether this requirement, no matter how well intended, violates the Second Amendment.

While, as stated, Defendants argue that the District of Columbia's "good reason"/"proper reason" requirement relates reasonably to its interest in preventing crime and protecting public safety, they have not established that relationship.

The fact that an individual may be able to demonstrate a greater need for self-protection, and therefore meets the "good reason"/"proper reason" requirement, does not indicate, in any way, whether that person is less likely to misuse handguns or may be less dangerous. *See Drake*, 724 F.3d at 454 (Hardiman, C.J., dissenting).[12] Nor does the District of Columbia's "good reason"/"proper reason" requirement make it less likely that those who meet this requirement will accidently shoot themselves or others or engage in criminal activity than those who cannot meet this requirement. *See id.* The fact that a person may have a greater need for self-protection says nothing about how limiting the carrying of handguns to such individuals would result in a reduction of risk to

other members of the public or reduce violent crime. Is the Court to conclude that people who do not have a heightened need for self-protection are more likely to commit violent crimes?

Furthermore, even if the Court were to accept the proposition that handguns are used disproportionately in the commission of violent crimes, how is that use related to whether or not a person has a greater need for self-protection? Moreover, isn't it possible that even persons who cannot manifest a present need for self-protection are just as likely to be victims of a violent crime. Simply put, the District of Columbia's "good reason"/"proper reason" requirement will neither make it less likely that those who meet this requirement will present a risk to other members of the public or commit violent crimes than those who cannot meet this requirement. Therefore, after reviewing the record in this case, the Court finds that Defendants have failed to demonstrate that there is any relationship, let alone a tight fit, between reducing the risk to other members of the public and/or violent crime and the District of Columbia's "good reason"/"proper reason" requirement.

This conclusion should not be read to suggest that it would be inappropriate for the District of Columbia to enact a licensing mechanism that includes appropriate time, place and manner restrictions on the carrying of handguns in public.[13] The

---

**12.** *See Drake*, 724 F.3d at 454 (Hardiman, C.J., dissenting) (stating that "it seems odd to suggest that one who obtains a handgun carry permit because he is in imminent danger is less likely to mishandle a gun than one who obtains a carry permit because he might want to exercise that right in the future even though he perceives no present danger").

**13.** *See Heller*, 554 U.S. at 626–27, 128 S.Ct. 2783 (noting that its opinion should not be construed to cast doubt on the validity of various "longstanding" time, place and man-

ner restrictions on the possession, carrying, and sale of handguns); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir.2015) (holding that a city ordinance that generally prohibited the possession, sale or manufacture of semi-automatic assault weapons and large capacity magazines did not violate the Second Amendment); *Heller v. Dist. of Columbia*, 45 F.Supp.3d 35 (D.D.C.2014) (holding that the challenged regulations pertaining to the registration of handguns did not violate the Second Amendment); *Parker v. Dist. of*

District of Columbia's arbitrary "good reason"/"proper reason" requirement, however, goes far beyond establishing such reasonable restrictions. Rather, for all intents and purposes, this requirement makes it impossible for the overwhelming majority of law-abiding citizens to obtain licenses to carry handguns in public for self-defense, thereby depriving them of their Second Amendment right to bear arms.

Accordingly, at this point in the litigation and based on the current record, the Court concludes that Plaintiffs have shown that they are likely to succeed on the merits of their claim that the District of Columbia's "good reason"/"proper reason" requirement runs afoul of the Second Amendment.

### 2. Irreparable harm

In *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir.2011), the Seventh Circuit addressed a Second Amendment challenge to the City of Chicago's Responsible Gun Owners Ordinance (the "Ordinance"), which the City had enacted four days after the Supreme Court's decision in *McDonald v. City of Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), which held that the Second Amendment applied to the States. The plaintiffs argued, among other things, that the Ordinance burdened the core Second Amendment right to possess firearms for self-defense because it conditioned possession on range training but simultaneously forbid range training everywhere in the City. The plaintiffs sought a preliminary injunction, but the district court denied their request. The Seventh Circuit reversed.

In addressing the requirement that the plaintiffs must establish irreparable harm in order to obtain a preliminary injunction, the court noted that for certain kinds of constitutional violations, particularly First Amendment claims, irreparable harm was presumed. *See Ezell,* 651 F.3d at 699 (citations omitted). The court explained that courts often presume that the loss of a First Amendment right causes irreparable harm "based on 'the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.'" *Id.* (quotation and other citation omitted). The court further explained that "[t]he Second Amendment protects similarly intangible and unquantifiable interests," which "cannot be compensated by damages." *Id.* (footnote omitted). Therefore, the court held that "the plaintiffs' harm [was] properly regarded as irreparable and having no adequate remedy at law." *Id.* at 700.

■ This Court agrees with the Seventh Circuit's reasoning in *Ezell* and finds that Plaintiffs have established that they are likely to succeed on the merits of their claim that the District of Columbia's "good reason"/"proper reason" requirement was unconstitutional when enacted and continues to violate their Second Amendment right to bear arms for the purpose of self-defense every day that the District of Columbia continues to enforce it. Thus, the Court concludes that Plaintiffs have established that they will suffer irreparable

*Columbia,* 478 F.3d 370, 399 (D.C.Cir.2007) (stating that "[t]he protections of the Second Amendment are subject to the same sort of reasonable [time, place and manner] restrictions that have been recognized as limiting, for instance, the First Amendment" (citation

omitted)). *Cf. Ezell v. City of Chicago,* 651 F.3d 684, 714 (7th Cir.2011) (stating that "historical context tells us that cities may take public safety into account in setting reasonable time, place and manner restrictions on the discharge of firearms within City limits").

harm if the Court does not grant their motion for a preliminary injunction.

### 3. Balance of the equities

■ Plaintiffs argue that, although they have suffered and will continue to suffer irreparable harm as long as Defendants continue to enforce their "good reason"/"proper reason" requirement, Defendants would not suffer any harm if the Court granted Plaintiffs' motion for a preliminary injunction. *See* Dkt. No. 6–2 at 28. They assert that Defendant Lanier virtually conceded that point when she commented on this Court's decision striking down the total carry ban stating, " 'Law-abiding citizens that register firearms, that follow the rules, are not our worry.' " *See id.* at 28–29 (quotation and footnote omitted). Furthermore, Plaintiffs argue that they are not requesting anything that would "impact[ ] the city's handgun registration requirements, which are generally stricter than state licensing requirements (if any) for the carrying of handguns, nor would the injunction impact any city carry restrictions as to time, place, and manner." *See id.* at 29.

Finally, Plaintiffs assert that an injunction "would not result in unlicensed handgun carrying." *See* Dkt. No. 10 at 27. Rather, "[t]he District would still have among the most stringent handgun carry licensing requirements in the country, requiring not just extensive training and background checks for applicants and registration of carried guns, but the full panoply of extreme (and dubious) restrictions upon licensed handgun carriers." *See id.* Plaintiffs note that an injunction would not "stop background checks, or training, or registration, or any other thing that the District wishes to impose on handgun carry license applicants. It [would] stop *only* the 'good/proper reason' requirement, and nothing else." *See id.* at 27–28. Thus,

Plaintiffs assert that, "[c]onsidering the extreme level of regulation untouched by the injunction, and the wealth of evidence demonstrating how licensed handgun carriers actually behave, . . ., the threat to the public harm would be virtually zero." *See id.* at 28. On the other hand, Plaintiffs argue that "the benefit to individuals, who could defend themselves from violent crime, would be significant." *See id.*

To the contrary, Defendants argue that the balance of equities tips heavily in their favor because an injunction would allow an unknown number of people to carry concealed handguns in the District of Columbia, which, in turn, would increase the risk of a gun-related tragedy to both those carrying the guns and the general public. *See* Dkt. No. 9 at 31–35. Defendants' assertions misapprehend the scope of the injunction that Plaintiffs are seeking.

As noted, Plaintiffs seek a very limited injunction. That is, they seek an injunction that only affects Defendants' ability to enforce the District of Columbia's "good reason"/"proper reason" requirement. They are not, as Defendants argue, seeking to prevent Defendants from enforcing the other provisions of the licensing mechanism nor do they seek to prevent Defendants from enacting and enforcing appropriate time, place and manner restrictions. Under these circumstances, the Court finds that the balance of the equities weighs in favor of granting Plaintiffs' request for a preliminary injunction.

### 4. The public interest

Plaintiffs argue that "[i]t is 'obvious' that 'enforcement of an unconstitutional law is always contrary to the public interest[,]' " *see* Dkt. No. 6–2 at 29 (quotation omitted); and, conversely, "enforcing the Constitution is *always* in the public interest[,]" *see* Dkt. No. 10 at 28.

Defendants, on the other hand, argue that it is Plaintiffs' interests, not the public's interest, that drive this lawsuit. *See* Dkt. No. 9 at 35. Furthermore, Defendants assert that " 'when an injunction would "adversely affect a public interest ... even temporarily ... the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.' " *See id.* (quoting *Goings v. Court Servs. & Offender Supervision Agency for the District of Columbia,* 786 F.Supp.2d 48, 60–61 (D.D.C.2011) (quoting *Yakus v. United States,* 321 U.S. 414, 440–41, 64 S.Ct. 660, 88 L.Ed. 834 (1944))). Defendants contend that, "[i]n this case, the public consequences of granting an injunction would be significant," in that allowing for additional weapons on the street, which would, in turn, increase the risk of mishaps, outweighs the individual's right to "self-identified personal safety." *See id.* at 36.

For the same reasons that the Court found that the balance of equities weighs in favor of Plaintiffs, the Court also finds that the public interest weighs in favor of Plaintiffs.

### C. Bond Requirement

Rule 65 of the Federal Rules of Civil Procedure provides, in pertinent part, that "[t]he court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined...." Fed.R.Civ.P. 65(c).

Plaintiffs argue that a court may dispense with this requirement when there is no risk of financial harm. *See* Dkt. No. 6–2 at 29 (citations omitted). Thus, Plaintiffs assert that the Court should dispense with the bond requirement in this case. *See id.*

Defendants did not address Plaintiffs' argument regarding this issue. Although it is true that Defendants would not suffer any financial damages if it were later determined that the Court wrongfully enjoined them from enforcing the District of Columbia's "good reason"/"proper reason" requirement, the Court finds it proper that Plaintiffs provide security in the amount of $1,000.00 pursuant to Rule 65(c).

## IV. CONCLUSION

After reviewing the entire file in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiffs' motion for a preliminary injunction is **GRANTED;** and the Court further

**ORDERS** that Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction are enjoined from enforcing the requirement of D.C.Code § 22–4506(a) that handgun carry license applicants have a "good reason to fear injury to his or her person or property or has any other proper reason for carrying a pistol," including, but not limited to, the manner in which that requirement is defined by D.C.Code § 7–2509.11 and 24 D.C.M.R. §§ 2333.1, 2333.2, 2333.3, 2333.4, and 2334.1, against Plaintiffs Brian Wrenn, Joshua Akery, Tyler Whidby, and other members of Plaintiff Second Amendment Foundation, Inc.; and the Court further

**ORDERS** that Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, are enjoined from denying handgun carry licenses to applicants who meet the requirements of D.C.Code 224506(a) and all other current require-

ments for the possession and carrying of handguns under District of Columbia law; and the Court further

**ORDERS** that, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, Plaintiffs shall post security in the amount of $1,000.00; and the Court further

**ORDERS** that counsel shall appear for a conference with the Court on Tuesday, July 7, 2015, at 11:00 a.m. to discuss an expedited schedule for the resolution of this case.

**IT IS SO ORDERED.**